ROGERS, Justice.
 

 Henry E. Crawford sued Thomas Bullock, Walter Mumphrey, Frank Glockner and the Independent Cab Operators Association to recover damages for the alleged negligent operation of a certain taxicab. In the District Court, judgment was rendered in favor of Crawford for $5,000 against all the defendants except Mumphrey. Bullock and the Independent Cab Operators Association appealed to the ■Court of Appeal for the Parish of Orleans. Glockner, who had failed to answer, did not appeal. The Court of Appeal reversed the judgment and dismissed the suit. Crawford v. Bullock, La.App., 20 So.2d 433. ■Certiorari brings the case here.
 

 The cab involved in the accident was •owned by Bullock and driven by Glockner. It was one of a group of cabs operating under the trade name of “Checker Cab.” Mumphrey is the owner of the trade name and was paid a certain sum regularly by the owner or operator of each cab for the use of the trade name. As provided by a municipal ordinance, the Independent Cab Operators Association furnished bond on the cab up to $5,000.
 

 Shortly after six o’clock on the morning of February 25, 1943, Crawford was severely injured when Glockner, the driver of the cab in which he was riding, fell asleep and permitted the cab to swerve over the curb of the sidewalk and crash into a tree. At the time of the accident, in addition to Crawford and Glockner, the cab was occupied by Surgen Fonseca and Abel Brown.
 

 Crawford’s cause of action is predicated upon his claim that he paid a fare to Glockner for himself and the other occupants of the cab and that the accident was caused by the negligence of Glockner for which all of the defendants were liable. The defendants, with the exception of Glockner who did not answer, denied that any fare had been paid or that Crawford was riding in the cab as a passenger for hire. They averred, on the contrary, that at the time of the accident Glockner was not acting in the scope of his employment; that he had ceased working for the day, and that the cab was not being operated as a taxicab, but was being used on a private mission of Glockner himself.
 

 Admittedly, the primary question involved in the case is whether Crawford was riding in Glockner’s cab as a passenger for hire or merely as a guest of Glockner. The testimony on the question is conflicting, but the Court of Appeal, unlike the District Court, resolved the conflict in favor of the defendants and held that Crawford was a guest and not a passenger in Glockner’s
 
 *555
 
 taxicab. Plaintiff complains of the reversal by the Court of Appeal of the judgment of the District Court on a question of fact. There is no merit in the complaint. The Court of Appeal is made the judge of facts, as well as of law. Const.1921, Art. 7, § 29. Where testimony is conflicting the Court of Appeal, in the exercise of its appellate jurisdiction, is bound to weigh it, as well as the court of original jurisdiction. And where the Court of Appeal differs with the court below as to the weight of the testimony, it is not only empowered, but it is its duty to reverse the judgment.
 

 We are satisfied from our examination of the record that the testimony amply sustains the findings of fact by the Court of Appeal. The Court properly held that Crawford was a guest and not a passenger for hire of Glockner.
 

 Plaintiff contends that a contract of carriage existed because he paid Glockner $1 as a fare for himself, Surgen Fonseca and Abel Brown, the other occupant of the cab. After discussing the testimony of the various witnesses on this crucial question, the Court of Appeals stated [20 So.2d 435]: “Though numerically the witnesses who said that the dollar was paid greatly preponderate, there are in the statements of those witnesses such strange inconsistencies and contradictions, and in others such a parrot like repetition that we find ourselves unable to believe them.”
 

 It is a familiar rule that where witnesses differ, their testimony must be considered in the light of their interest in the case and of its probability and consistency with the surrounding circumstances. When tested by this rule, the testimony of the witnesses who said the dollar was paid does not impress us as to its truthfulness.
 

 These are the facts as we find them: At about four o’clock in the morning on February 25, 1943, Glockner checked in at the headquarters of the Checker Cab Company and announced that he would not carry any more passengers that night. Immediately thereafter, without charging them any fare, he drove his friends, Humphrey, LaHoste and Martin, to the St. Regis Restaurant at the corner of Carrollton and Washington Avenues, where his friends ate some chicken. From the restaurant, Glockner drove to the Trailway Bus Station where Humphrey and Martin left the cab. He then took LaHoste to the Jung Hotel, after which he drove to the Magazine Grill, Humphrey following in his own cab which he had taken charge of at the bus station. The Magazine Grill is a barroom located at Poeyfarre and Magazine Streets, near the main office of the Yellow Cab Company. It is used as a club or gathering place by taxicab drivers during their spare or off hours. When Glockner entered the Magazine Grill, he observed Crawford, Fonseca and Brown, who had been in the grill for several hours, standing at the bar drinking beer. He joined them, but stated that he had no drinks at all and only bought a package of cigarettes. The four men were friends prior to their meeting in the Magazine Grill. Glockner testified that Crawford spoke to him about riding home and that he agreed to take him, but did not want any fare and then Crawford shoved a
 
 *557
 
 dollar bill in his pocket and a discussion concerning fish took place.
 

 Crawford himself testified that he offered Glockner a dollar to drive him home, which Glockner accepted. But the testimony shows that when the party left the Magazine Grill, Glockner did not know where either Crawford or Fonseca lived, yet he insists that he gave Glockner a dollar to drive the three men to Brown’s home and then to drive two of those men to their homes. Fonseca testified that he did not see Crawford give Glockner a dollar, but that he heard Crawford offer Glockner a dollar. Warren Dragon, Louis Stein and Herbert Schussler, Yellow Cab drivers, testified as rebuttal witnesses for plaintiff. Stein did not know anything except that he weis in the barroom at about 4:30 o’clock in the morning and he saw Crawford pay Glockner a dollar to take him home. He testified that at the time he was twelve feet away from the parties in an admittedly crowded barroom. Dragon testified that he generally rode home some of the drivers who lived in his neighborhood; that he walked into the barroom to see if any drivers were in the booths; that as he walked out he stopped, took a quarter out of his pocket and-put it in the cigarette machine; that after he got his cigarettes and while he was facing the door, he- saw Crawford hand Glockner a dollar and that he then walked out and went back to the Victory Restaurant. Under cross-examination Dragon stated he was in the Magazine Grill only two or three minutes, but Schussler, who followed him as a witness for plaintiff, testified that Dragon was in the barroom for sometime, and, in fact, had come to the bar and stood beside him. Dragon testified that plaintiff’s witness, Stein, was standing with Crawford and Glockner, whereas Stein himself testified that he was standing with Fonseca and Brown twelve feet away from Crawford and Glockner. Schussler said that he saw Crawford and Glockner talking together but that he could not “catch their conversation” ; that the only thing he knew was that he saw Crawford hand Glockner a dollar bill.
 

 Dave Humphrey, who followed Glockner into the Magazine Grill, testified that he overheard Crawford and Glockner talking about some fish and that they asked him to go along but he refused. He further testified that from his knowledge and observation no money passed between Crawford and Glockner. Abel Brown, who was working for the Yellow Cab Company on the day Crawford was injured, testified that he left work in the morning about three o’clock and went to the Magazine Grill, where he met Fonseca and Crawford who were standing at the bar drinking beer. He joined them and they remained at the bar engaged in conversation and drinking beer for at least two hours. He stated that they talked about going to the market to get some fish to have a fish party and that he told Crawford and Fonseca he had some fish which he got the night before from his uncle who lived at Lafitte; that since they got into the conversation about .eating fish and drinking beer, he invited them to his •house to have some fish, and Crawford was supposed to bring the beer. He further testified that he had ridden home with Glockner on a number of previous occa
 
 *559
 
 sions and never paid any fare; that Glockner came in while they were discussing the fish party and he was invited to join in the party; that when the four men left the Grill it was their intention to go to his house to eat fish and drink beer. He further testified that while he was in the Grill no money passed from Crawford to Glockner or from any other person to Glockner, and that he heard no conversation about money; that when the party reached his home, he found his wife was sick and that it was impossible for them to have the' fish party at his house. He so informed the other men and after giving them the fish, wrapped in one package, he asked them to go somewhere else to have the party; that after he gave them the fish, they left his home and did not know what happened thereafter.
 

 Although there is some dispute among the witnesses as to whether they went to Brown’s house to have a fish fry or merely to get some fish to take to their respective homes, the evidence is convincing that they had planned to have a fish fry at Brown’s house and took along some bottled beer to drink at the party. When they reached Brown’s house, they all went inside but found that Brown’s wife was ill and that they were unable to have the party there as planned. They remained in Brown’s house for ten or fifteen minutes and then left to go to Crawford’s house carrying the fish with them wrapped only in one package. After leaving Brown’s home and before reaching Crawford’s home, the accident happened.
 

 Our appreciation of all the testimony in this case leaves no doubt in our minds that Glockner, Brown, Crawford and Fonseca had arranged to indulge in a fish party and that there was never any intention on the part of any of them to enter into a contract of carriage. They were friends and obviously were out to enjoy themselves. Because of the illness of Mrs. Brown, Crawford, Glockner and Fonseca left Brown’s house to have the party at Crawford’s home. All the witnesses stated that taxicab drivers do not charge other taxicab drivers for riding in their taxicabs although sometimes they chip in to help pay for the gasoline. Crawford, Fonseca and Brown had been in the Magazine Grill for approximately two hours drinking beer before Glockner came in. The evidence* shows also that there was beer in the taxicab at the time they left for Brown’s house.
 

 In view of the fact that it is not the custom of a taxicab driver to exact fares from other taxicab drivers and the further fact that Glockner and the other occupants of the cab were going on the party together, it would not be unusual but, on the contrary, it would be the usual thing for Glockner to be driving his friends without making any charge therefor.
 

 The Court of Appeal properly held that since it had reached the conclusion plaintiff was not riding in Glockner’s cab as a passenger for hire, it was not necessary to consider plaintiff’s other contentions.
 

 Counsel for plaintiff, in argument and in brief, has indulged in an extensive discussion of Ordinance 13825, Commission
 
 *561
 
 Council Series, requiring taxicab operators to furnish bond, and its effect upon the doctrine announced in Atkins v. Points, 148 La. 958, 88 So. 231.
 

 Defendants set up as an alternative defense that because Bullock, the owner, only-rented the taxicab to Glockner for a fixed sum per day and had no interest in its profits, they were not liable for plaintiff’s injuries caused by the negligence of Glockner. This defense was based upon the doctrine announced in Atkins v. Points that the owner who merely rents his cab to another person is not liable for the injuries caused by the negligence of that person. But the alternative defense of defendants and the case of Atkins v. Points were not considered by the Court of Appeal because it reached the conclusion that plaintiff did not establish his contract of carriage. Since we have reached the same conclusion, we find nothing to review in the judgment of the Court of Appeal on this phase of the case.
 

 For the reasons assigned, the judgment of the Court of Appeal is affirmed.